# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 16, 2018 Session

## KRISTIN McKENZIE ET AL. v. WOMEN'S HEALTH SERVICES – CHATTANOOGA, P.C. ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 14C539     L. Marie Williams, Judge**

_____

**No. E2017-00091-COA-R3-CV**

_____

Kristin McKenzie and her husband, Joshua McKenzie, filed this health care liability action individually, and on behalf of their infant child, Jacob, who sustained injuries during his birth. As a result of these injuries, Jacob has limited use of his left arm. The plaintiffs allege that defendant Dr. Matthew A. Roberts was negligent in the delivery of Jacob. They assert that he applied a vacuum extractor during the delivery without first obtaining mother's informed consent. Following a two-week trial, the jury returned a verdict in favor of Dr. Roberts and his employer. Plaintiffs argue that the trial court committed several errors that entitle them to a new trial. They claim that the court erred in allowing the introduction of evidence that violates the collateral source rule. Specifically, they argue that the defendants were allowed to extensively cross-examine plaintiffs' witnesses regarding possible health insurance benefits under the Affordable Care Act and other benefits under the Individuals with Disabilities Education Act. The plaintiffs argue that the defendants pursued this line of interrogation in an attempt to show that some of Jacob's needs would be covered by these collateral sources. The plaintiffs state that the trial court also erred in restricting the scope of the plaintiffs' argument. Plaintiffs assert that the trial court erred in instructing the jury on the sudden emergency doctrine. Finally, they argue that the trial court erred in its jury instruction regarding the concepts of "foresight" and "hindsight." Plaintiffs appeal, arguing reversible errors on the part of the trial court. We vacate the trial court's judgment on the jury verdict. We affirm some of the actions of the trial court, actions that are challenged by plaintiffs. We vacate the trial court's order awarding the defendants $81,343.47 in discretionary costs. This case is remanded to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated in Part and Affirmed in Part; Case Remanded for Further Proceedings**

-1-

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Joe Bednarz, Sr., Joe Bednarz, Jr., Cole D. Rogers, Hendersonville, Tennessee, Pamela Pantages, Cleveland, Ohio, and Steven R. Walker, Oakland, Tennessee, for the appellants, Kristin McKenzie and Joshua McKenzie, as Next Friends and Natural Guardians of Jacob McKenzie.

James E. Looper, Jr. and Jennifer M. Eberle, Nashville, Tennessee, for the appellees, Women's Health Services – Chattanooga, P.C., dba Associates in Women's Health, and Matthew A. Roberts.

**OPINION**

**I.**

The delivery and injury occurred on February 18, 2011. Mother was admitted to the hospital and labor was induced. Around the time Jacob's head became visible, Dr. Roberts arrived to deliver him. Dr. Roberts testified that

> when I realized that she wasn't effectively pushing, the baby was at what's called a plus 5 station, it was crowning when I decided that she just needed a little extra help to deliver the baby.

According to Dr. Roberts, he asked mother if she wanted assistance delivering the baby. She replied in the affirmative. He applied a vacuum extractor, placing a suction cup on Jacob's head. After one pull with the vacuum, his head "tortoise-shelled" back into the birth canal. All of the medical experts agreed that this indicated a delivery complication known as a shoulder dystocia, meaning that the baby's shoulder was lodged behind the mother's pubic bone and he was stuck. Dr. Roberts immediately called for further assistance.

Dr. Roberts and the attendant nurses began a series of maneuvers to alleviate the shoulder dystocia. The first procedure, called the McRoberts maneuver, involves re-positioning the mother's legs. The second step – suprapubic pressure – involves placing pressure at the mother's pubic bone. These relatively simple maneuvers, performed by the nursing staff at Dr. Roberts' direction, are usually sufficient to alleviate the problem, according to the testimony of the medical experts. However, such was not the case with Jacob. Next, Dr. Roberts performed a Woods maneuver, which involved placing his hands in the birth canal and trying to rotate the baby's shoulders in a kind of corkscrew

motion. This maneuver also was not successful in getting Jacob unstuck. According to the medical records, Jacob's head was delivered at 9:37 p.m. Dr. Adio Abdu arrived a few minutes later and assisted by performing a delivery of Jacob's posterior arm. His body was delivered at 9:41 p.m.

Jacob suffered a fractured humerus and extensive nerve damage resulting in paralysis of his left arm. His Apgar score, a measure of how vigorous a baby is, was zero at one minute, a condition that some of the witnesses described as "born dead" and subsequently revived. He also incurred brain injuries, the extent of which were disputed at trial. Jacob was taken to the intensive care unit and stabilized. He later underwent shoulder surgery that allowed him limited use of his arm.

Plaintiffs filed this action on April 28, 2014, alleging the negligence of Dr. Roberts and his employer, Women's Health Services–Chattanooga, P.C. After extensive discovery, both sides filed numerous motions in limine. Plaintiffs moved "to exclude all evidence regarding all collateral sources . . . that may have been paid to Jacob McKenzie or his parents in the past or that may be available to them in the future." The trial court denied the motion. Defendants filed a motion in limine "to exclude any comment, reference, or argument by Plaintiff[s'] counsel that this case is analogous to any case in which a defendant's negligence is compared to the duty of the average person." The trial court granted this motion.

Trial began on July 20, 2016, and ended on August 2, 2016. Defendants argue that the situation of the shoulder dystocia, and the uncommon difficulties in remedying it, constituted a sudden emergency. Plaintiffs disputed this, arguing that the proof did not support an instruction to the jury regarding the sudden emergency doctrine. The trial court agreed with defendants and instructed the jury on sudden emergency. The jury instruction also included the following statement, which plaintiffs challenge as error on appeal: "foresight, not hindsight is the standard by which a defendant's duty of care is to be judged."

Plaintiffs argue that Dr. Roberts was liable for failing to obtain mother's informed consent before applying the vacuum extractor. In response, defendants pointed out that mother signed a consent form upon admission that states as follows:

> I hereby authorize Dr. Matthew Roberts and the assistants of choice to perform upon Kristin McKenzie [t]he following procedure(s): Induction of labor, vaginal delivery, possible caesarian section, and to do any other procedures that in the judgment of the above name[d] physician may be necessary.

> The nature and purpose of the operation, or procedure, possible alternative methods of treatment, the risks involved, and the benefits have been explained to me.

The parties presented conflicting proof regarding whether Dr. Roberts adequately disclosed the risks and benefits of the procedure at issue, thereby obtaining Mother's informed consent. The trial court instructed the jury, in pertinent part, as follows:

> The existence of a signed consent form gives rise to a presumption of consent in the absence of proof of misrepresentation, inadequate disclosure, formally [*sic*: forgery] or lack of capacity. This proof may come in the form of the evidence you have received. The meaning of the informed – excuse me, the meaning of the consent form is a question of fact for you to decide.

During mother's pregnancy, defendants administered a one-hour glucose tolerance test for gestational diabetes to mother. This test requires that the patient drink a laboratory-supplied beverage called Glucola, which has 50 grams of carbohydrates. The patient's blood is drawn and tested an hour later. At trial, mother and Tina Barber, her mother, testified that mother was given a can of Coca Cola instead of Glucola during the test. Defendants disputed this assertion and presented proof to the contrary. Plaintiffs attempted to argue that the administration of an ordinary Coca Cola did not comply with the standard of reasonable care. Defendants objected that this theory had not been disclosed during pretrial discovery. Defendants also asserted that no plaintiff's expert had testified to how many grams of carbohydrates were in an ordinary can of Coke, nor opined that giving mother a Coke instead of Glucola violated the standard of care. The trial court agreed that plaintiffs were attempting to inject a new "surprise" theory of liability at trial. The court instructed the jury that any testimony regarding the allegation of a can of Coke during the glucose tolerance test should be limited to a consideration of the credibility of witnesses, and not as a ground for liability.

The jury returned a defense verdict. The trial court granted defendants' motion for discretionary costs, ordering plaintiffs to pay $81,343.47 for expert witness fees and court reporter fees. Plaintiffs timely filed a notice of appeal.

## II.

Plaintiffs raise the following issues:

1. Whether the trial court erred in allowing evidence of potential benefits to plaintiffs from collateral sources that may cover some of Jacob's medical and educational needs.

2. Whether the trial court erred in granting defendant's motion in limine to preclude any argument by plaintiff's counsel analogizing this case to "any case in which a defendant's negligence is compared to the duty of the average person."

3. Whether the trial court erred in instructing the jury that "foresight, not hindsight is the standard by which a defendant's duty of care is to be judged."

4. Whether the trial court erred in instructing the jury on the sudden emergency doctrine.

5. Whether the trial court erred in improperly instructing the jury on informed consent.

6. Whether the trial court erred in limiting plaintiffs' cross-examination regarding the difference between Glucola and Coca Cola, giving a limiting instruction the jury, and granting a directed verdict with respect to the issue of whether providing a Coca Cola in a glucose tolerance test was a deviation from the standard of care.

7. Whether the trial court erred in ordering plaintiffs to pay $81,343.47 in discretionary costs.

## III.

### A.

The issue of the applicability of the collateral source rule is a question of law – involving statutory interpretation – which we review de novo with no presumption of correctness. ***Dedmon v. Steelman***, 535 S.W.3d 431, 437 (Tenn. 2017). In ***Dedmon***, the Supreme Court undertook a comprehensive review and examination of the collateral source rule, "which excludes evidence of benefits to the plaintiff from sources collateral to the tortfeasor and precludes the reduction of the plaintiff's damage award by such

collateral payments." *Id.* at 433.[1] The *Dedmon* Court observed that "the collateral source rule has evolved as both a substantive rule of law and an evidentiary rule." *Id.* at 443. Regarding the substantive aspect of the collateral source rule, the High Court said the following:

> Substantively, it affects the amount of damages that may be awarded against a defendant by prohibiting reduction of a plaintiff's recovery by benefits from sources unrelated to the tortfeasor.

*Id.* The evidentiary aspect of the rule "bars 'any evidence that all or part of a plaintiff's losses have been covered by insurance.' " *Id.* at 444 (quoting *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008)); *see also* *Fye v. Kennedy*, 991 S.W.2d 754, 763 (Tenn. Ct. App. 1998) ("Normally, of course, in an action for damages in tort, the fact that the plaintiff has received payments from a collateral source, other than the defendant, is not admissible in evidence and does not reduce or mitigate the defendant's liability."). According to *Dedmon*,

> Comment *c* to Section 920A [of the Restatement (Second) of Torts] relates to the evidentiary component of the collateral source rule. This comment lists the type of benefits precluded by the collateral source rule: (1) insurance policies, whether maintained by the plaintiff or a third party, (2) employment benefits, either gratuitous or arising out of contract, (3) gratuities, and (4) social legislation benefits, such as social security benefits, welfare, and pensions.

535 S.W.3d at 444.

However, "[i]n 1975, [the state] legislature enacted health care legislation that partially abrogated the collateral source rule in health care liability lawsuits." *Id.* at 445. Tenn. Code Ann. § 29-26-119 (2012) provides:

> In a health care liability action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury, including, but not limited to, cost of reasonable and necessary medical care, rehabilitation

---

[1] The *Dedmon* opinion was released after briefing was completed in this case.

services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Plaintiffs argue that the trial court erred when it denied their motion in limine to "exclude all evidence regarding all collateral sources . . . that may have been paid to [plaintiffs] in the past or that may be available to them in the future." At the pretrial motion hearing, the following discussion took place:

> THE COURT: Well, I read [Tenn. Code Ann. § 29-26-119] and I believe the Tennessee cases have been reading the statute that the statute is applicable in medical malpractice cases that are in trial. It is the trial that establishes the liability or not unless it is admitted. I disagree with the plaintiffs' interpretation of the statute in that regard, and I find that the plaintiff's motion should be overruled in its entirety.
>
> PLAINTIFFS' COUNSEL: Your Honor, are you saying that they can introduce evidence under the Affordable Healthcare Act?
>
> THE COURT: I think they are going to have to be able to under the statute.
>
> PLAINTIFFS' COUNSEL: Your Honor, the way I read the plain language of that statute is while it says that –
>
> THE COURT: Only to the extent that such costs are not paid or payable or such losses are not replaced or indemnified in whole or in part by insurance, et cetera, et cetera, et cetera.
>
> PLAINTIFFS' COUNSEL: Right, and the Affordable Healthcare Act is simply an insurance policy that they are

paying for, so that's – that's just like telling them about any other policy of health insurance.

DEFENSE COUNSEL: It's actually a tax according to the United States Supreme Court in two different opinions, must be paid by everybody. And so therefore this plaintiff must obtain a policy under the Affordable Care Act. And if we can introduce the cost of a policy under that act that would cover all the alleged damages instead of $300,000 in medical bills, $2,000 a month or whatever, that's allowed under the statute in Tennessee.

PLAINTIFFS' COUNSEL: When they – it's an insurance policy, Your Honor, it's paid for out of their assets.

THE COURT: Well, I hate to say it but the Supreme Court did say it was a tax and I agree it's an insurance policy, the cost of which is shared by all taxpayers. Do the defendants simply want to be able to cross-examine on the Affordable Care Act and have only any uncovered portion of the bill be admitted into evidence?

MR. LOOPER: Yes, Your Honor, I think that's correct. Yes, Your Honor.

THE COURT: I think that's where we are. You know, there are a lot of things about the Affordable Care Act lot of people don't like and a lot of things they do like. But the Supreme Court did say it was a tax.

At trial, plaintiffs presented the testimony of Dr. Cynthia Louise Wilhelm, who testified that she does "life care planning and case management and vocational analysis in litigation cases." Dr. Wilhelm prepared a life care plan for Jacob, estimating the amount of medical and other expenses he would incur in the future due to his injuries. Defense counsel, cross-examining her, stated the following in pertinent part:

Q: First of all, you're aware of the Affordable Care Act, correct?

A. I am.

Q. And under the Affordable Care Act as a matter of law everyone must have coverage, correct?

A. That's what the law says.

Q. Did you take that into account when you drafted your life care plan?

A. I didn't use a collateral source in doing a life care plan.

Q. Under Tennessee law, the Affordable Care Act is to be taken into account. You did not do that, correct?

[Trial court overrules plaintiffs' renewed objection.]

Q. So your plan does not consider the Affordable Care Act and how it would impact those numbers, correct?

A. I don't think it would impact the numbers, that's all I would say. It's not going to impact the numbers.

\*     \*     \*

Q. So you haven't actually gone and read what the coverages under the ACA are or anything of that nature?

A. No, I have. I have done that. I did that before. But I'm telling you as a member of the life care planning and working with the international life care planners, they have addressed this issue for the last six months and finally came out with statements about it as well, so I've done both of that.

Defendants also cross-examined Dr. Francis Rushing, an economics expert, on the applicability and impact of insurance coverage under the Affordable Care Act.

The jury heard extensive testimony about the Individuals with Disabilities Education Act (IDEA), and the educational benefits it may provide Jacob. Dr. Howard Schub, a pediatric neurologist, testified that "schools are required to provide therapy and things of that nature for children with disabilities." Cathlin Vinett Mitchell, a registered

nurse specializing in case management and rehabilitation nursing, was called as a witness for the defense. She testified that the IDEA requires "every school in the United States" to provide necessary services to disabled children at no charge, including occupational therapy, behavioral and cognitive therapy evaluation, speech and language evaluation, assisted technology evaluation, physical therapy evaluation, computer hardware, software and educational tools, and "adaptive equipment." Defense counsel asked Mitchell ten times whether the IDEA would require a school to provide these benefits "at no charge," and she answered yes, assuming they were found to be necessary. Mitchell further testified as follows:

> Q. Now, there's been some mention, defense counsel says the school therapy is free of charge. Well, that's not entirely accurate, is it?
>
> A. It's tax dollars.
>
> Q. Tax dollars, so it's the taxpayers of Tennessee that end up having to pay for this therapy, correct?
>
> A: Like myself, yes.

Defendants also similarly cross-examined Dr. Wilhelm at length regarding the IDEA and its potential benefits. The trial transcript contains at least ten pages of Dr. Wilhelm's testimony on this subject. We will not reproduce all of them here; suffice it to say the jury heard extensive testimony on the potentially "free" benefits that the IDEA might provide Jacob and his family, in an attempt to persuade them that his alleged damages would be taken care of by another source.

Defendants argue that the trial court correctly interpreted Tenn. Code Ann. § 29-26-119. We disagree. The collateral source rule developed in Tennessee as a common law principle. In **Dedmon**, the Supreme Court was "asked to modify Tennessee's common law regarding the collateral source rule," *id.* at 454. The High Court declined. The Supreme Court – observing that "[r]ecent reports of the impending death of the collateral source rule are greatly exaggerated" – stated, "[w]e choose not to alter existing law in Tennessee regarding the collateral source rule." *Id.* at 466. As the Supreme Court has further recognized:

> Because Tennessee Code Annotated section 29-26-119 is in derogation of the common law rule that allowed plaintiffs to recover medical expenses, whether paid by insurance or not, it must be strictly construed.

-10-

*Hunter v. Ura*, 163 S.W.3d 686, 711 (Tenn. 2005) (citing ***Steele v. Ft. Sanders Anesthesia Group, P.C.***, 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994)). We apply this rule of strict construction in interpreting section 119.

By its express terms, the statute only applies to "a health care liability action in which liability is admitted or established." Tenn. Code Ann. § 29-26-119. In the present case, liability was *not* admitted or established at the time pertinent to the inquiry regarding the admissibility of collateral source evidence, *i.e.*, during the jury trial. Furthermore, as defendants recognize in their brief, "[t]he plain language of the statute speaks to what is to be included in a damage award after liability is admitted or established; the statute says nothing about *proof* as to damages and their reasonableness before the jury has returned its verdict." (Emphasis in original). Defendants are correct that section 119 speaks exclusively to damages, and does not address admissibility of evidence. We hold that Tenn. Code Ann. § 29-26-119 does not alter or abrogate the evidentiary aspect of the collateral source rule. Under that rule, parties in health care liability actions may not introduce evidence that all or part of a plaintiff's losses have been covered by insurance or another collateral source until after liability has been admitted or established. After a jury returns a verdict imposing liability, the trial court may apply the rule of damages set forth in section 119 upon request of the defendant.

The reasons for the evidentiary rule were well explained by the ***Dedmon*** Court as follows:

> One court has explained that evidence of insurance should not be presented to the jury "[b]ecause the likelihood of misuse by the jury clearly outweighs the probative value of evidence of collateral benefits." ***Kenney*** [***v. Liston***], 760 S.E.2d [434,] 441 (W.Va. 2014)]. "The theory is 'that the jury may well reduce the damages based on the amounts that the plaintiff has been shown to have received from collateral sources.'" *Id*. (quoting ***Ratlief v. Yokum***, 167 W.Va. 779, 280 S.E.2d 584, 590 (1981)); ***Loncar v. Gray***, 28 P.3d 928, 933 (Alaska 2001) ("The collateral source rule exclud[es] evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages." (internal quotations omitted)); ***Proctor v. Castelletti***, 112 Nev. 88, 911 P.2d 853, 854 (1996) (adopting per se rule barring admission of evidence of a collateral source of payment for any purpose because "[t]here is an ever-present danger that the jury will

misuse the evidence to diminish the damage award"); ***Jurgensen v. Smith***, 611 N.W.2d 439, 442 (S.D. 2000) (excluding collateral-source evidence "because of the danger that the jury may be inclined to . . . reduce a damage award, when it learns that plaintiff's loss is entirely or partially covered" (internal quotations omitted)).

535 S.W.3d at 444-45. Our interpretation of section 119 avoids these dangers while still fully effectuating the legislature's intention to limit a health care liability plaintiff's damages under the prescribed circumstances.

Defendants argue that any error in violation of the collateral source rule was harmless. We again disagree. First, it is impossible to determine with any confidence that the extensive evidence of collateral sources, such as health insurance under the ACA and benefits under the IDEA, did not have a prejudicial impact on the jury's deliberations. Second, the statements made during cross-examination by defense counsel were erroneous and misleading. He stated that "under Tennessee law, the Affordable Care Act is to be taken into account," and asked of Dr. Wilhelm, "under the Affordable Care Act as a matter of law everyone must have coverage, correct?" She responded, "that's what the law says." In fact, the United States Supreme Court reached the opposite conclusion in ***Nat'l Fed. Of Indep. Bus. v. Sibelius***, 567 U.S. 519, 132 S.Ct. 2566 (2012), wherein it stated:

> While the individual mandate clearly aims to induce the purchase of health insurance, it need not be read to declare that failing to do so is unlawful. Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS. The Government agrees with that reading, confirming that if someone chooses to pay rather than obtain health insurance, they have fully complied with the law.

> \*     \*     \*

> The Affordable Care Act's requirement that certain individuals pay a financial penalty for not obtaining health insurance may reasonably be characterized as a tax.

-12-

*     *     *

> The Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command. The Federal Government does have the power to impose a tax on those without health insurance. Section 5000A is therefore constitutional, because it can reasonably be read as a tax.

567 U.S. 567-68, 132 S.Ct. 2596-97; 567 U.S. 574-75, 132 S.Ct. 2600-01.

The trial court placed great emphasis on the fact that the U.S. Supreme Court characterized the penalty for not having health insurance as a tax. We are of the opinion that the characterization of the penalty under federal law for not carrying health insurance is irrelevant to the question of whether evidence of a plaintiff's health insurance should be presented to the trier of fact. Both the penalty and its classification as a tax are now largely academic, because Congress has subsequently repealed the penalty provision for noncompliance with the individual mandate of the ACA. *See* 26 U.S.C.A. § 5000A(c)(1), (2)(B)(iii), (3)(A).

The Superior Court of Pennsylvania was presented with the same issue now before us in ***Deeds v. Univ. of Pa. Med. Ctr.***, 110 A.3d 1009 (Pa. Super. 2015). In that case, defense counsel cross-examined a life care planner witness on potential health care benefits under "the individual mandate portions of President Obama's Affordable Care Act" and Medicaid. *Id.* at 1013. The ***Deeds*** court, holding that "[t]his is a patent violation of the collateral source rule [which] requires remand for a new trial," said:

> in some instances, the violation of the collateral source rule can affect the jury's deliberation and decision on the issue of liability. As our Supreme Court noted in ***Lobalzo v. Varoli***, 409 Pa. 15, 185 A.2d 557 (1962), in some cases where there is a violation of the collateral source rule,
>
>> . . . When an error in a trial is of such consequence that, like a dash of ink in a can of milk, it cannot be strained out, the only remedy, so that justice may not ingest a tainted fare, is a new trial . . .

*     *     *

-13-

> On this record, we can have little confidence that the verdict as to [Defendants'] negligence *vel non* was unaffected by the collateral source evidence and argument. Accordingly, the trial court erred in denying [plaintiff's] motion for a new trial. The ink was in the milk; we cannot now extract it through magic or chemistry.

*Id.* at 1013-14 (internal citation omitted); *see also* **Kenney**, 760 S.E.2d at 441 ("calling attention to the fact that a plaintiff had hospitalization or medical insurance can be prejudicial error because the jury may conclude that plaintiff sustained no damages for which he was entitled to recover if his medical bills were paid by insurance.") (internal brackets and quotation marks omitted).

We adopt the analysis of the **Deeds** court. Accordingly, we conclude that the violations of the collateral source rule were not harmless error. The trial court's judgment is vacated and the case remanded for further proceedings.

**B.**

As already stated, the trial court granted defendants' motion in limine "to exclude any comment, reference, or argument by Plaintiff['s] counsel that this case is analogous to any case in which a defendant's negligence is compared to the duty of the average person." The general rule regarding argument of counsel is as stated by the Supreme Court:

> We recognize that argument of counsel is a valuable privilege that should not be unduly restricted. Our courts seek to give great latitude to counsel in expressing their views of the case to the jury.

**Smith v. State**, 527 S.W.2d 737, 739 (Tenn. 1975); *accord* **State v. Sexton**, 368 S.W.3d 371, 418-19 (Tenn. 2012); **Terry v. State**, 46 S.W.3d 147, 156 (Tenn. 2001); **State v. Tallent**, No. W2009-00585-CCA-R3-CD, 2011 WL 303216, at *9 ("It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments.").

Defendants argue that the trial court correctly precluded any arguments by analogy because a health care liability plaintiff generally must prove, by expert testimony, the

-14-

recognized standard of acceptable professional practice, that the defendant failed to act with ordinary and reasonable care in accordance with that standard, and that the negligence proximately caused injury. Tenn. Code Ann. § 29-26-115(a) (2012). Thus, they assert, "analogies are not appropriate when discussing distinct burdens of proof." But Tenn. Code Ann. § 29-26-115(d) provides that the burden of proof in a health care liability action is not different from an ordinary negligence action: "[i]n a health care liability action . . . , the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant." Moreover, Tennessee Courts have recognized that Tenn. Code Ann. § 29-26-115 "codifies the common law elements of negligence – duty, breach of duty, causation, proximate cause, and damages." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (citing *Cardwell v. Bechtol*, 724 S.W.2d 739, 753 (Tenn. 1987); *Dubois v. Haykal*, 165 S.W.3d 634, 638 (Tenn. Ct. App. 2004); *see also* *Estate of French v. Stratford House*, 333 S.W.3d 546, 555 (Tenn. 2011) (stating that "medical malpractice is a category of negligence"), *abrogated on other grounds by statute as recognized by* *Ellithorpe v. Weismark*, 479 S.W.3d 818, 820 (Tenn. 2015).

We are of the opinion that the trial court erred in entering a pretrial order that amounts to a prophylactic prior restraint on counsel's privilege to argue by analogizing this health care liability action to any ordinary negligence case. The Court of Criminal Appeals has aptly observed that "beside diligent research, analogy is any competent counsel's stock-in-trade tool for legal arguments." *Trice v. State*, No. 01C01-9511-CR-00370, 1997 WL 359198, at *2 (Tenn. Crim. App. 1997). Generally speaking, an analogy is often a useful tool for helping the trier of fact understand a difficult or complicated concept. If, during a trial, counsel makes an argument by analogy that is particularly inappropriate or misleading, opposing counsel may then make an objection that the trial court can resolve on a case-by-case basis. If an analogy is simply bad or inapt, then it is the prerogative of opposing counsel to point this out to the jury and explain why. We hold the trial court erred in granting defendants' motion in limine.

We vacate the trial court's blanket order on the defendants' motion in limine regarding argument by analogy.

**C.**

The trial court instructed the jury as follows:

> In a healthcare liability action, a defendant cannot be found negligent on the basis of an assessment of a patient's condition which only later or in hindsight proved to be inaccurate, as long as the initial assessment was made in

-15-

accordance with the then-reasonable standards of medical care. In other words, foresight, not hindsight is the standard by which a defendant's duty of care is to be judged.

Plaintiffs argue that the "foresight/hindsight" instruction was error. "The determination of whether jury instructions are proper is a question of law," *Adams v. Hendersonville Hosp. Corp.*, No. M2006-01068-COA-R3-CV, 2007 WL 1462245, at *3 (Tenn. Ct. App., filed May 18, 2007), which "will be reviewed under a purely de novo standard, with no presumption of correctness." *Id.*

As we have recently observed,

> The trial court's instructions guide the jury in its deliberations. The instructions must be plain and understandable, and must inform the jury of each applicable legal principle. *Wielgus v. Dover Indus.*, 39 S.W.3d 124, 131 (Tenn. Ct. App. 2001). They must also reflect the theories that are supported by the parties' pleadings and proof, as well as the parties' claims and defenses. *Cole v. Woods*, 548 S.W.2d 640, 642 (Tenn. 1977). Jury instructions must be correct and fair as a whole, although they do not have to be perfect in every detail. *Wielgus*, 39 S.W.3d at 131. Upon review, we read a trial court's instructions to the jury in their entirety and in context of the entire charge. *See id.* Additionally, where the trial court's instructions clearly and definitely set forth the elements upon which liability must be based, the failure to recite each element in the verdict form will not render the verdict invalid. *State v. Faulkner*, 154 S.W.3d 48, 62 (Tenn. 2005).

*Commercial Bank & Trust Co. v. Children's Anesthesiologists, P.C.*, 545 S.W.3d 470, 476 (Tenn. Ct. App. 2017) (quoting *Goodale v. Langenberg*, 243 S.W.3d 575, 584 (Tenn. Ct. App. 2007)).

In *Adams*, a medical malpractice (currently termed "health care liability") case, this Court analyzed at great length a charge similar to the one challenged here:

> The trial court charged the jury, over objections by Appellant, that "foresight, not hindsight, is the standard by which a professional's *duty* of care is to be judged" (emphasis added). It is "foreseeability," not foresight, that is

an essential element of the duty of care in a tort case whether such involves a professional or otherwise.

\*   \*   \*

In "Words and Phrases" Permanent Edition, Vol. 17 (2004-Suppl. 2006), 180 cases from American jurisdictions are digested under the word "foreseeability" while another 89 cases are digested under "foreseeable." Only four cases dealing primarily with jury instructions in common carrier cases, are digested under the word "foresight." In all of these older cases, the use of "foresight" in defining the duty of a common carrier is condemned in the absence of a temporizing instruction to the jury that "foresight" does not mean "foreknowledge." ***Fillingham v. St. Louis Transit Co.***, 102 Mo.App. 573, 77 S.W. 314 (Mo. Ct. App. 1903). As stated by the Court of Error and Appeals of New Jersey:

> By 'foresight' is meant, not foreknowledge absolute, nor that exactly such an accident as has happened was expected or apprehended; but rather that the characteristics of the accident are such that it can be classified among events that, without due care, are likely to occur, and that due care would prevent.

***Davis v. Public Serv. Co-Ordinated Transport***, 113 N.J.L. 427, 174 A. 540, 541 (N.J. 1934).

\*   \*   \*

The standard by which the duty of the defendant is measured, however, is universally held to be foreseeability, not foresight that envisions foreknowledge. Whether a defendant is a professional or not a professional, the duty element of a tort is measured by foreseeability.

-17-

2007 WL 1462245, at *7, *9, *10 (internal citation omitted). The ***Adams*** Court held "[t]he charge to the jury of 'foresight' over the objections of Appellant, coupled with the refusal of the trial court to charge the jury as to 'foreseeability' as requested," to be reversible error. ***Id.*** at *11.

Defendants correctly point out that the present case is distinguishable to some degree because in this case, the trial court also gave an instruction regarding foreseeability, unlike ***Adams***. Thus, if the "foresight" charge were the only error in the present case, it may not have been so harmful as to require reversal. Nevertheless, the teaching of ***Adams*** is quite clear that a "foresight" charge is erroneous, misleading and to be avoided.

**D.**

Plaintiffs argue that the trial court erred in charging the jury with the sudden emergency doctrine as follows:

> A physician who is faced with a sudden or unexpected emergency that calls for immediate action is not expected to use the same accuracy or judgment as a person acting under normal circumstances who has time to think and reflect before acting. A physician faced with a sudden emergency is required to act within the recognized standard of care applicable to that physician. A sudden emergency will not excuse the actions of a person whose own negligence created the emergency.
>
> If you find that there was a sudden emergency that was not caused by any fault of the person whose actions you are judging, you must consider this factor in determining fault.

Defendants argued at trial that the shoulder dystocia, and the unusual failure of the ordinary maneuvers to resolve it, constituted a sudden emergency. The Supreme Court has explained this doctrine as follows:

> The sudden emergency doctrine, which has now been subsumed into Tennessee's comparative fault scheme, recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as

-18-

one acting under normal circumstances who has time for
reflection and thought before acting.

*McCall v. Wilder*, 913 S.W.2d 150, 157 (Tenn. 1995) (internal citation omitted); *accord*
*VanDyke v. Foulk*, No. E2016-00584-COA-R3-CV, 2017 WL 4125371, at *9 (Tenn. Ct.
App., filed Sept.18, 2017); *Olinger v. Univ. Med. Ctr.*, 269 S.W.3d 560, 563 (Tenn. Ct.
App. 2008). If the sudden emergency doctrine is at issue, "it must be considered as a
factor in the total comparative fault analysis." *Id.*

All of the medical experts agreed that a shoulder dystocia is a known risk that can
occur in any vaginal delivery. Dr. Donald Stanley Horner, an obstetrician and
gynecologist called by plaintiffs, testified that shoulder dystocias occur in around 2 to 3
percent of deliveries. Dr. Joseph DeWane, another OB/GYN called by the defense,
testified that they occur in about 0.4 to 1.8 percent of cases. Obstetrician Dr. Lowell
McCauley, Jr., another defense witness, testified that the incidence of shoulder dystocia is
"about two to five per thousand" deliveries. When a shoulder dystocia occurs, it is an
urgent situation because there is a high likelihood of the umbilical cord being constricted,
cutting off the blood supply to the infant. The experts generally agreed that the risk of
injury to the infant increases the longer the dystocia is unresolved, and that by around
four minutes, there is a serious risk and concern for the infant's health.

When it appeared that Jacob's shoulder was caught behind his mother's public
bone, Dr. Roberts and his staff took a series of steps that the evidence shows are
generally in keeping with common obstetric practice: he called for assistance, cut an
episiotomy, performed the McRoberts maneuver, and had the nurses apply suprapubic
pressure. Dr. Roberts estimated that he had delivered around 10,000 babies in his career,
and had encountered three shoulder dystocias, including Jacob's, that did not resolve with
these procedures. He testified that "shoulder dystocias that require more than McRoberts
and suprapubic are incredibly rare" and "constitute an emergency in the delivery room."
Dr. DeWane testified as follows:

> McRoberts in itself will relieve about 40 percent of shoulder
> dystocias. If you use McRoberts and suprapubic pressure, the
> Rubin's 1 maneuver, you relieve probably anywhere from 58
> to 60 percent of them.

Dr. Horner agreed that "probably 80 to 90 percent" of shoulder dystocias resolve with
these two procedures.

After the procedures did not resolve Jacob's shoulder dystocia, Dr. Roberts tried
the Woods maneuver:

> I perform what's called a Woods maneuver, like I said earlier, it's like a corkscrew motion. I want to have the baby's head, I'll take my fingers, reach in to try to grab the shoulders and corkscrew the shoulders because they are stuck anterior. I'm trying to move the shoulders to the most oblique angle one way or the other.

About two minutes later, after the Woods maneuver failed to work, Dr. Abdu arrived and delivered Jacob's posterior arm.

Dr. Roberts and Dr. DeWane each testified unequivocally that shoulder dystocias are "unpreventable and unpredictable." Dr. McCauley agreed, testifying as follows:

> A shoulder dystocia is an unpreventable, unpredictable, inevitable – it's an uncommon obstetrical emergency. But they are all unpreventable, they are all unpredictable. If you look at all the different parameters that we've tried to use through the years to figure out who might have a shoulder dystocia and who might not, none of the factors are of any value, none of them can predict anything. Maybe the best-case scenario is 25 percent, but then you still miss 75 percent of them. No matter which factors you look at, all of them, they are – there's no way to predict it. It's unpredictable. It's unpreventable.

Dr. Horner testified, "It's unpredictable. However, okay, there are risk factors that I discussed, okay, which makes it more likely to occur." According to Dr. Horner, these factors increasing the risk of shoulder dystocia include small maternal stature, maternal obesity, gestational diabetes, induction of labor, epidural anesthesia, application of the vacuum extractor, and large infant size. Dr. McCauley disagreed and testified to the contrary, saying,

> Q. Is receiving an epidural a risk factor for a shoulder dystocia?
>
> A. No, it is not.
>
> Q. Is receiving an induction a risk factor for a shoulder dystocia?

A. No, it is not.

Q. What about maternal obesity?

A. No.

Q. Short stature?

A. No.

Q. Operative vaginal delivery?

A. No.

Q. Macrosomia?[2]

A. No.

Q. And Doctor, we've heard and I want you to assume that we've heard testimony that all of these are risk factors. If they are risk factors, do they have any clinical significance for an obstetrician at the bedside exercising his judgment on how to proceed with the delivery?

A. They not only have no predictive value, they have no clinical value either. If they had predictive value they would have clinical value. They have neither.

Dr. DeWane testified similarly that "the so-called risk factors for shoulder dystocia" do not "have any clinical significance."

On cross-examination, Dr. Horner was presented with a publication of the American College of Obstetricians and Gynocologists, and he testified as follows:

Q. Now, Doctor, if you look on page 2 under clinical considerations and recommendations, it asks the question can shoulder dystocia be predicted accurately, correct?

A. Correct.

_____

[2] "Macrosomia" means a newborn infant size that is significantly larger than average.

Q. And it lists several of the things that you list as potential predictive factors, correct?

A. Correct.

Q. But then the last sentence of that paragraph says: In each case risk factors can be identified but their predictive value is not high enough to be useful in a clinical setting. Is that correct?

A. That's what it says.

Defendants, arguing the trial court correctly charged the jury on the sudden emergency doctrine, rely upon *Olinger*, another shoulder dystocia case where this Court upheld a similar jury instruction. We observed in *Olinger*:

> [T]he jury returned a general verdict for all of the defendants. We do not know if the jury actually found that there was a sudden emergency and the defendants acted appropriately in light of that sudden emergency, or whether the jury found there was no sudden emergency and the defendants' actions were nevertheless within the recognized standard of professional practice. The point being, the issue on appeal is not whether there actually was or was not a sudden emergency, only whether there was sufficient proof in the record to support the Trial Court's decision to so charge the jury. All of the medical proof at trial was that shoulder dystocia is a somewhat rare but known occurrence, and shoulder dystocia not being resolved by the McRoberts maneuver and suprapubic pressure is considerably more rare. . . .
>
> We agree with Plaintiffs' argument that because of a physician's training and background, the sudden emergency doctrine has a limited application in medical malpractice cases. Simply because there is a medical complication does not necessarily mean that there is a sudden emergency. We are not, however, willing to go as far as argued by Plaintiffs and hold that the sudden emergency doctrine never is applicable in a medical emergency situation. Having said

-22-

that, we conclude that there was sufficient proof presented at trial that the circumstance underlying the sudden emergency doctrine, *i.e.*, the existence of a sudden or unexpected emergency, was present in this case when there was material evidence presented to the jury that the shoulder dystocia did not resolve after application of the McRoberts maneuver and suprapubic pressure, something not seen or experienced by Dr. Lanning in his twenty-one years as an obstetrician delivering roughly 4,000 babies.

269 S.W.3d at 568-69.

Plaintiffs rely on our more recent opinion in ***VanDyke***, which did not involve a shoulder dystocia, but addressed the applicability of the sudden emergency doctrine in a childbirth case involving an infant's bradycardia, or "relatively slow heart action." 2017 WL 4125371, at *1, n.5. In ***VanDyke***, a discussion lasting around 30 seconds took place among the doctors regarding how best to deliver the baby after its heart rate dropped. ***Id.*** at *8. We stated:

> The parties in this case place emphasis on whether the emergency must be both sudden and unexpected. The record reflects that the emergent situation presented was a sudden occurrence but was not unexpected . . . [W]e believe the greater distinction in this case lies in whether the defendant physicians were presented with a sudden or unexpected emergency that "call[ed] for immediate action" as opposed to someone who "ha[d] time for reflection and thought before acting." Here, Dr. Foulk testified,
>
> > I was assessing, can I do a [cesarean] section? Can I do forceps or vacuum? I can't do a vacuum. You think through your head as you are saying algorithms. Here's what I'm presented with. I'm thinking on my toes, I'm thinking quickly. Here's my options. What's the safest option? Help is coming so I have more hands-on deck if needed. She was making progress but it wasn't going to be quick enough to get him out [safely] and still be alive or intact, so we had to deliver him at that point.

Dr. Foulk also conferred with her delivery team before Dr. Herrell arrived. Further, Drs. Foulk and Herrell conferred together and decided on what they considered the best course of action before proceeding.

Accordingly, we conclude that the court erred in issuing a jury instruction on the sudden emergency doctrine when the defendant physicians had time, while minimal, for reflection and thought before deciding on the best course of action.

*Id.* at *9-10 (brackets in original). The *VanDyke* Court remanded for a new trial. *Id.* at *10.

In the present case, there is no testimony in the record indicating time to think and reflect before deciding on the best action, nor is there proof of any discussion of options among medical personnel, as in *VanDyke*. The record does contain the following testimony, however, from Dr. Horner, plaintiffs' own expert:

But you have a certain amount of time, okay, to deliver the baby once the head is delivered and you recognize shoulder dystocia. It's an emergency situation, okay, and there's frequently a lot of, you know, lot of anxiety and panic, okay. And everybody is excited in the labor and delivery room, the doctor's nervous, okay, the nurses are nervous, okay, trying to get the patient to push harder, okay, pull harder, okay, or do whatever to get that baby out.

\* \* \*

This is an emergency situation, okay. It's kind of a panic situation, okay. You're trying to do your best, okay, and trying to get that baby out, okay, as quickly as possible. But you probably have more than two minutes. You probably have more than three minutes, okay. You may have even more than four minutes to get that baby out before there's any hypoxic anoxic deficiency of oxygen in the brain.

As we did in *Olinger*, we hold in the present case that "there was sufficient proof presented at trial that the circumstance underlying the sudden emergency doctrine, *i.e.*,

the existence of a sudden or unexpected emergency, was present in this case when there was material evidence presented to the jury that the shoulder dystocia did not resolve after application of the McRoberts maneuver and suprapubic pressure." 269 S.W.3d at 569.

Plaintiffs contend that the trial court should not have charged the jury with sudden emergency because Dr. Roberts caused or contributed to the sudden emergency. They cite and rely upon **Kowalski v. Eldridge**, 765 S.W.2d 746, 749 (Tenn. Ct. App. 1988) ("The party asserting the sudden emergency doctrine must be free of fault in creating the emergency in whole or in part") and **Sanders v. Johnson**, 859 S.W.2d 329, 333 (Tenn. Ct. App. 1993) ("If the conduct of the party seeking a sudden emergency charge contributed to the emergency, he is not entitled to the charge"). We note that **Kowalski** was decided before the Supreme Court adopted comparative fault in Tennessee, *see* **McIntyre v. Ballentine**, 833 S.W.2d 52 (Tenn. 1992), and **Sanders**, which cites **Kowalski** for the relied-upon proposition, was decided before the Supreme Court recognized that the sudden emergency doctrine had been subsumed into the comparative fault scheme. *See* **Eaton v. McLain**, 891 S.W.2d 587, 592 (Tenn. 1994). Moreover, in **Sanders**, the defendant expressly admitted that he was at fault in contributing to the emergency. 859 S.W.2d at 333. In the present case, there is evidence in the record from which the jury could have concluded that Dr. Roberts caused or contributed to the shoulder dystocia, primarily the testimony of Dr. Horner. There is also evidence from which the jury could have drawn the opposite conclusion, including Dr. Roberts' unequivocal denial that he did anything to cause the shoulder dystocia, and the supporting testimony of Drs. DeWane and McCauley.

Consequently, the question of whether Dr. Roberts caused or contributed to the sudden emergency, if in fact the jury found a sudden emergency, was properly presented to the trier of fact for it to decide. The jury was correctly instructed that "[a] sudden emergency will not excuse the actions of a person whose own negligence created the emergency." In **Boshears v. Brooks**, No. E2015-01915-COA-R3-CV, 2016 WL 3704487, at *6 (Tenn. Ct. App., filed July 6, 2016), we addressed and upheld the same instruction, stating:

> The doctrine of sudden emergency does have provision for fault or negligence on the part of the individual whose conduct is at issue. The Trial Court stated in its instruction given to the jury: "A sudden emergency will not excuse the actions of a person whose own negligence created the emergency." It is not as though a sudden emergency renders an individual's otherwise tortious conduct appropriate.

-25-

Rather, it is but one consideration that the jury is to take into account.

Plaintiffs argue that the sudden emergency instruction "incorrectly commingles the actions of a 'physician' with those of a 'person.' " Perhaps the instruction would have been slightly better, or closer to "perfect," if it had referred exclusively to a "physician" instead of interchanging the word "person." We think it was clear enough to the jury that, in the context of this instruction, "person" was generally referring to the physician whose actions are in question. *See* **Evans ex rel. Evans v. Williams**, No. W2013-02051-COA-R3-CV, 2014 WL 2993843, at *11 (Tenn. Ct. App., filed June 30, 2014) (rejecting plaintiff's contention "that the sudden emergency instruction in this case was misleading regarding the standard of care because of the instruction's use of the term 'person' rather than 'physician.' "). The trial court did not err in the instruction it gave to the jury.

**E.**

As already stated, mother signed a consent form when she entered the hospital for childbirth. It authorized Dr. Roberts and staff to induce labor, deliver the child vaginally or possibly by c-section, "and to do any other procedures that in the judgment of [Dr. Roberts] may be necessary." The consent form further states,

> I have been given an opportunity to ask questions about my conditions, alternative forms of treatment, risks of the planned procedures, risks of non-treatment, the procedures to be used and the risks and benefits involved, and I believe that I have sufficient information to give this informed consent.

Mother testified that she did not read the form before signing it.

Plaintiffs argue that Dr. Roberts failed to obtain mother's informed consent to have the vacuum extractor applied to assist delivery. The trial court charged the jury on informed consent as follows:

> A physician has a duty to give a patient certain information before treating the patient. The information the physician must disclose is that information about the treatment involved and its attendant risks to enable the patient to make an intelligent decision about whether to undergo the treatment. The information that must be provided to the patient is that information that should be provided by physicians in the

-26-

specialty in the community in which the physician practices or in similar communities.

In this case, plaintiff has the burden of . . . proving by expert testimony all of the following elements: Number one, what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the treatment or procedure and the risks of it; number two, that the defendant departed from that standard; and number three, that a reasonable patient in plaintiff's position would have refused the treatment or procedure if properly advised of the risks of the treatment or procedure or chosen an alternative treatment or procedure.

In determining how a reasonable patient would have acted under the circumstances, you should consider the testimony of the patient, the patient's idiosyncrasies, fears, age and medical condition, the presence or absence of alternative procedures or treatments and the potential risks and benefits thereof and the impact of no treatment or procedure on the plaintiff's health.

When the healthcare provider performs the treatment or procedure without the requisite informed consent of the patient, liability attaches for the resulting injuries if there is a lack of informed consent regardless of whether those injuries resulted from negligence.

The existence of a signed consent form gives rise to a presumption of consent in the absence of proof of misrepresentation, inadequate disclosure formally [*sic*: forgery] or lack of capacity. This proof may come in the form of the evidence you have received. The meaning of the informed – excuse me, the meaning of the consent form is a question of fact for you to decide.

Plaintiffs assert that the instruction regarding the consent form was erroneously given. Defendants respond that it is an accurate statement of the law in Tennessee, and is appropriate because in this case mother signed a consent form. In ***Church v. Perales***, 39 S.W.3d 149, 161 (Tenn. Ct. App. 2000), this Court stated:

As a general matter, the law presumes that persons who sign documents, having been given an opportunity to read them, are bound by their signatures. This rule applies in medical battery and informed consent cases. Thus, the law presumes that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms, and general meaning of consent forms involving medical treatment. Thus, *the existence of a signed consent form gives rise to a presumption of consent in the absence of proof of misrepresentation, inadequate disclosure, forgery, or lack of capacity*.

(Emphasis added; internal citations omitted); *accord* **Mitchell v. Kayem**, 54 S.W.3d 775, 781 (Tenn. Ct. App. 2001). In **Russell v. Brown**, No. E2004-01855-COA-R3-CV, 2005 WL 1991609, at *7 (Tenn. Ct. App., filed Aug. 18, 2005), the plaintiff challenged a jury instruction worded identically to the one at issue here. We upheld the instruction, observing that "the language in **Church** mirrors that included in the trial court's charge to the jury." We hold that the language of the trial court's charge was not erroneous.

Plaintiffs argue, however, that it should not have been given because there was proof of "inadequate disclosure" in that the consent form did not specifically refer to the vacuum extraction procedure. But whether there was adequate disclosure under the circumstances was an issue of fact for the jury to decide. The jury was informed that the presumption of consent could be rebutted by a showing of inadequate disclosure. Dr. Roberts testified that he asked mother if she wanted help in delivering Jacob and she said yes. He stated that he showed her the vacuum extractor, said it would help the baby come out, and asked for and obtained her permission to use it. Mother testified to the contrary that he didn't explain the vacuum extractor or ask her permission before he applied it. Dr. Roberts further testified as follows:

Q. Well, you didn't explain any of the risks to her at all of the vacuum, correct?

A. No. It's not my standard to talk about the risks when I perform a vacuum extraction.

\* \* \*

Q. The standard of care entitles Mrs. McKenzie to informed consent, correct?

-28-

A. Yes, and my take on the informed consent, when I asked her if she consented to allow me to do the vacuum extractor.

*    *    *

Q. Okay.  So back to informed consent.  Informed consent under the law is patient has the right to know what the procedure is, agree?

A. Agree.

Q. Patient has the right to know what the . . . benefits of the procedure are, agreed?

A. Agreed.

Q. Patient has the right to know what the risks of the procedure are, agreed?

A. Yes.

Q. And the patient has the right to know whether there are any reasonable alternatives to the procedure that you're recommending, agreed?

A. Yes.

Q. And you and I can agree that that did not happen in the office or in the delivery room, true?

A. My interpretation of consent is what I told you, I consented to help her do the delivery and I offered the vacuum and that's how I handled the consent.

Q. Well, just because you handled it that way doesn't mean that you met the legal requirements, Dr. Roberts, and that's why we're here.

A. Okay.

-29-

Q. So I'm going to try the question one more time. Proper informed consent which she's entitled to and what you're on duty to do is explain the procedure, explain the benefits, explain the risks, explain the alternatives, four things, and you and I can agree that that didn't happen either in the delivery room or in your office with Mrs. McKenzie, true?

A. Well, yes, that's true.

Q. Okay. So we can agree that you violated your duty of informed consent to this patient, true?

A. For the technician, I don't know that I'm going to agree that I violated. My interpretation of consent is when I asked for permission.

Q. For a procedure that you deemed to be the one that should be done, right?

A. In my training and how I perform procedures, yes.

Q. All right. If I have defined legal informed consent accurately, you and I can agree that you violated legal informed consent as it relates to Mrs. McKenzie both in the office and in the delivery room, true?

A. From a legal standpoint, yes.

Plaintiffs rely on the above-quoted testimony in arguing that Dr. Roberts "admitted" violating the standard of informed consent. Defendants counter by pointing out Dr. Roberts' additional testimony:

Q. And Doctor, while you don't remember the specifics of your conversation, you have a routine that you do in discussing the vacuum with your patients, correct?

A. Yes.

Q. And that routine is to show them the vacuum?

-30-

A. Yes, I do.

Q. And to ask them if they would like help with this procedure?

A. Yes.

Q. And to explain to them how the vacuum works?

A. Yes, and I show them what it looks like and what – how I'm going to use it.

Q. And you also explain to them that there is a risk that the caput will be worse?

A. Yes, my routine, especially like I said earlier, caput is a swelling of the head. And when you put the vacuum on the part of the head it's going to increase the caput on the head.

Q. And that's something you do every time you use a vacuum, correct?

A. Yes, that's pretty much standard, not only complications that I talk about, but at that time of consent, I don't go over every single complication because it's not indicated at that time of when I'm applying the vacuum.

Q. And Ms. McKenzie agreed to have the vacuum used after you went over that with her, correct?

A. Yes.

Q. And once you did that, did it comply with the standard of care in obtaining consent from Ms. McKenzie to utilize the vacuum?

A. Yes, I feel like it did.

The jury also heard Dr. DeWane's opinion on this subject. He testified:

Q. In obtaining consent did the standard of care require that Dr. Roberts go through every single risk of a vacuum?

A. Not at all.

Q. Did the information that was provided by Dr. Roberts satisfy the standard of care as far as consent to utilize a vacuum to finish this delivery?

A. It did.

＊　　＊　　＊

Q. Did Dr. Roberts obtain appropriate consent for both the induction and the use of the vacuum?

A. Yes, he did.

As can be seen, the jury heard conflicting testimony on whether the information Dr. Roberts provided complied with the standard of care, and whether mother gave her informed consent. Plaintiffs' argument on appeal regarding the jury instruction is that the proof was so overwhelmingly in favor of the conclusion that Dr. Roberts violated the standard that the consent form instruction should not have been given. This argument asks us to reweigh the evidence in manner that apparently conflicts with the jury's assessment, which we decline to do. We find no error in the trial court's instruction on informed consent.

**F.**

The plaintiffs next argue that "the trial court erred in limiting [plaintiffs'] cross-examination regarding the difference between Coca Cola, in giving a limiting instruction the jury, and in granting a directed verdict with respect to use of Coca Cola being a deviation from the standard of care." The trial court instructed the jury as follows:

There has been frankly new data, new information that's come into this trial this afternoon. There have been questions about the substance that Mrs. McKenzie drank for the glucose tolerance test. I'm not making any comment, assessments,

-32-

draw no inference from me about what the truth of the whole situation is. We're not going there.

But I am going to give you a very specific limiting instruction. You may consider the issue of what substance she was given to drink only specifically and only for the purpose of assessing the credibility of this witness's testimony about the glucose tolerance test.

There has not been any cause of action pled, no claim pled that there was a deviation from the standard of care based on the fact that a Coke was used. Were you to find that a Coke was used, I don't know if it was or wasn't, that's going to be – may or may not be a question for you all. But that's a new theory that's come up today. And in all cases, and specifically in cases that rely on expert testimony as medical negligence cases do, they are – you've heard us talk about Rule 26 disclosures, that's part of the discovery process where both parties are required to disclose to each other the expert opinions well in advance of trial so that everything can be fully explored and you as the jurors get a full and fair picture of the case.

So you may only consider that issue on assessing the credibility of the testimony of this witness on the glucose tolerance test.

We will not overly belabor our discussion of this issue, because it is largely moot and academic at this stage of the litigation. First, we do not find that the trial court abused its discretion in making this ruling. Second, the ruling was based on the trial court's opinion that defendants had been unfairly surprised by a new and undisclosed theory at trial, a factor that will not be present upon remand and at a new trial.

## G.

The trial court ordered plaintiffs to pay $81,343.47 in discretionary costs under Tenn. R. Civ. P. 54.04, which provides:

> (1) Costs included in the bill of costs prepared by the clerk *shall be allowed to the prevailing party* unless the court

-33-

otherwise directs, but costs against the state, its officers, or its agencies shall be imposed only to the extent permitted by law.

(2) Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees; travel expenses are not allowable discretionary costs. . . . *In the event an appeal results in the final disposition of the case, under which there is a different prevailing party than the prevailing party under the trial court's judgment, the new prevailing party may request discretionary costs* by filing a motion in the trial court, which motion shall be filed and served within thirty (30) days after filing of the appellate court's mandate in the trial court pursuant to Rule 43(a), Tenn. R. App. P.

(Emphasis added.) We have observed that "Tenn. R. Civ. P. 54.04(2) permits prevailing parties in civil actions to recover 'discretionary costs.' " **Boggs v. Rhea**, 459 S.W.3d 539, 547 (Tenn. Ct. App. 2014) (quoting **Duran v. Hyundai Motor America, Inc.**, 271 S.W.3d 178, 214-15 (Tenn. Ct. App. 2008)). Because defendants are no longer the prevailing parties, we vacate the trial court's award of discretionary costs.

## IV.

In summary, we hold that the trial court erred in allowing testimony in violation of the collateral source rule. Accordingly, we vacate the trial court's judgment on the jury's verdict and remand this case to the trial court for further proceedings. Furthermore, we vacate the trial court's blanket order – granted pretrial in response to the defendants' motion in limine – regarding argument by analogy. In addition, we follow the teaching of **Adams v. Hendersonville Hosp. Corp.**, No. M2006-01068-COA-R3-CV, 2007 WL 1462245 at *1 (Tenn. Ct. App. May 18, 2007), in holding that "[i]t is 'foreseeability,' not foresight, that is an essential element of the duty of care in a tort case." **Adams**, 2007 WL 1462245 at *7. We find no error in the trial court's charge to the jury on the subject of "the sudden emergency doctrine." Furthermore, we find no error in the trial court's instruction to the jury on "informed consent." The trial court's decision on the "Coca Cola v. Glucola" issue is moot in view of our decision to vacate the trial court's judgment on the jury's verdict and remand for further proceedings. Since, at this stage of the

proceedings, we have concluded that the appellees are now no longer the "prevailing party," we vacate the trial court's award to them of discretionary costs.

**V.**

The judgment of the trial court is vacated in part and affirmed in part. This case is remanded for further proceedings. Costs on appeal are assessed to the appellees, Women's Health Services – Chattanooga, P.C., dba Associates in Women's Health, and Dr. Matthew A. Roberts.

_____
CHARLES D. SUSANO, JR., JUDGE